RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

EDWARD R. HILLS (19-3372); YAZAN B. AL-MADANI
(19-3549); SARI ALQSOUS (19-3573 & 20-3160),

                *Defendants-Appellants.*

Nos. 19-3372/3549/3573/20-3160

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:16-cr-00329—Sara E. Lioi, District Judge.

Argued: October 26, 2021

Decided and Filed: March 3, 2022

Before: GUY, MOORE, and GIBBONS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Russell S. Bensing, Cleveland, Ohio, for Appellant Hills. Jonathan A. Bartel, BARTELL, GEORGALAS & JUAREZ, Independence, Ohio, for Appellant Al-Madani. Robert L. Sirianni, Jr., BROWNSTONE, P.A., Winter Park, Florida, Alan M. Dershowitz, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellant Alqsous in 19-3573. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Russell S. Bensing, Cleveland, Ohio, for Appellant Hills. Jonathan A. Bartel, BARTELL, GEORGALAS & JUAREZ, Independence, Ohio, Richard H. Drucker, MARGARET WONG & ASSOCIATES, Cleveland, Ohio, for Appellant Al-Madani. Robert L. Sirianni, Jr., BROWNSTONE, P.A., Winter Park, Florida, for Appellant Alqsous in 19-3573 and 20-3160. Alan M. Dershowitz, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellant Alqsous in 19-3573. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

––––––––––––––––––

**OPINION**

––––––––––––––––––

RALPH B. GUY, JR., Circuit Judge.  Dr. Edward Hills, Dr. Sari Alqsous, and Dr. Yazan Al-Madani were convicted by a jury of various fraud and related offenses connected to their employment in the Dental Department of a publicly owned hospital located in Cuyahoga County, Ohio.  Dr. Tariq Sayegh—who also was convicted of several bribery-related counts—has voluntarily dismissed his appeal.  The three defendants before us challenge their convictions and sentences on various and, at times, overlapping grounds.  For the reasons that follow, we affirm.

**OVERVIEW**

Dr. Hills started at MetroHealth as a dental resident in 1993, and rose quickly to serve as Chair of the Dental Department from 1997 until his discharge at the end of December 2014.  Hills was called upon to address the hospital's financial losses in 2007, and was credited with a turn around that resulted in net gains of $89 million over the next eighteen months.  Hills also served as MetroHealth's COO from 2010 until his departure and as interim CEO during his last year with MetroHealth.  Drs. Al-Madani, Alqsous, and Sayegh—as well as unindicted coconspirator Dr. Hussein Elrawy—were first dental residents and then attending dentists under the direct supervision of Dr. Hills.[1]  Most of the charges in the 33-count indictment related to seven fraudulent schemes, which also served as predicate offenses for the RICO conspiracy charge (Count 1).  A brief roadmap of the schemes and their related counts of conviction follows:

- ***Stream of Benefits Bribery Scheme.*** From 2009 through 2014, Hills solicited and received bribes (in cash and other things of value) from Alqsous, Al-Madani, and Elrawy in exchange for favorable treatment with respect to their employment at MetroHealth (*i.e.*, bonuses, schedules, and an accommodation for a preferred candidate for residency).  The jury found Hills, Alqsous, and Al-Madani each guilty of Conspiracy to Commit Hobbs Act bribery (Count 2).

––––––––––––––––––

[1]Al-Madani started as a resident in 2007, and Alqsous became a resident in 2008; both worked as attending dentists until April 2016.

- ***Dental Resident Bribery Scheme.*** From 2008 until 2014, Alqsous, Al-Madani, and Sayegh solicited and/or accepted bribes from dentists applying to the dental residency program at MetroHealth. Hills, however, was not charged in any counts related to this scheme. Alqsous, Al-Madani, and Sayegh were each convicted of Conspiring to Commit Bribery Concerning a Program Receiving Federal Funds (Count 3) and Conspiring to Commit Honest Services Mail and Wire Fraud (Count 4). This scheme also resulted in substantive convictions for federal-program bribery: one count against Alqsous and Sayegh (Count 5) and two counts against Al-Madani and Sayegh (Counts 6 and 7).[2]

- ***Oral Health Enrichment (OHE) Scheme.*** From 2009 through 2013, Hills and unindicted business partner Julie Solooki operated Oral Health Enrichment (OHE) to provide training for dentists with discipline or performance issues. Some of OHE's business was accomplished using MetroHealth personnel, equipment, or facilities without permission or compensation. Hills, Alqsous, and Al-Madani were convicted of Conspiracy to Commit Money or Property Mail and Wire Fraud (Count 8). Hills was also convicted of four related substantive counts of Money and Property Mail Fraud (Counts 9-12). Alqsous and Al-Madani were acquitted of those same substantive charges.[3]

- ***Patient Referral Kickback Scheme.*** In March 2014, Hills announced that MetroHealth's dental patients could be referred to Buckeye Dental Clinic—a private clinic owned by Alqsous and Al-Madani—for which Hills received payments that included seven checks notated "consulting fees." This resulted in the convictions of Hills, Alqsous, and Al-Madani for Conspiracy to Solicit, Receive, Offer and Pay Health Care Kickbacks (Count 13) and Conspiracy to Commit Honest Services and/or Money and Property Mail Fraud (Count 28). The seven checks from Noble Dental—another private clinic owned by Alqsous and Al-Madani—were the basis of the substantive convictions (1) of Hills for receipt of the kickbacks (Counts 14-20) and (2) of Alqsous and Al-Madani for offering or paying such kickbacks (Counts 21-27).

- ***Obstruction of Justice Scheme.*** Hills, Alqsous, and Al-Madani were each convicted of Conspiracy to Obstruct Justice after the FBI investigation commenced in May 2014 (Count 29). Evidence of that conspiracy included recorded discussions during a dinner meeting, a warning to one of the bribing residents to stay quiet, preparing a 1099 to hide the "kickback" payments to Hills, and telling a grand jury witness to "forget about" seeing envelopes of cash. Al-Madani also was convicted of making false statements to the FBI in connection with the investigation (Count 30).

---

[2]Alqsous was acquitted on Counts 6 and 7.

[3]Some of the briefing inaccurately states that Al-Madani was convicted of Counts 9-12. The verdicts and the judgments show that both he and Alqsous were acquitted of those charges.

The RICO Conspiracy count alleged two additional schemes that were not the subject of any separate charges:

- ***Jordan Dental Work Scheme.*** Between 2008 and 2011, Hills arranged for his attorney Anthony Jordan to receive extensive dental work at MetroHealth without charge for which Jordan paid Hills personally instead (Count 1).
- ***Free Labor Scheme.*** For the period from 2008 through 2010, Hills assigned MetroHealth residents, including Alqsous and Al-Madani, to work at Noble Dental for which they were compensated personally (Count 1).[4]

Finally, Hills also was convicted of filing false tax returns for 2011-2013, but he does not challenge those convictions or the portion of the restitution he was ordered to pay that represented $80,426 in unpaid taxes. (Counts 31-33).

After trial, the district court denied defendants' renewed Rule 29 motions for judgment of acquittal, as well as Alqsous's Rule 33 motion for new trial. A two-day hearing was conducted regarding the common sentencing issues before any of the defendants' individual sentencing hearings. The district court imposed aggregate terms of imprisonment of: 188 months for Hills, 151 months for Alqsous, and 121 months for Al-Madani. They were also ordered to pay restitution, some jointly and severally, in amounts approaching $1 million. These appeals followed.[5]

## I. UNTIMELY APPEAL

A procedural wrinkle forms the basis of Alqsous's separate untimely appeal. Alqsous had filed a notice of appeal prior to the judgment, a separate notice of appeal from the restitution order, and a third notice of appeal once judgment was entered. When Alqsous filed a motion to amend his previous motion for judgment of acquittal or new trial, this court held his appeal in abeyance. (No. 19-3573, Doc. 3.) But when the district court denied that motion on the merits, Alqsous did not file a new (or amended) notice of appeal from that order. Alqsous moved for an extension of time to appeal, which the district court denied. We review the denial of such a

---

[4]Alqsous and Al-Madani did not own Noble Dental at that time.

[5]Sayegh was sentenced to 60 months of imprisonment (Counts 3-7).

motion for abuse of discretion.  *See Nicholson v. City of Warren*, 467 F.3d 525, 526 (6th Cir. 2006).

Rule 4(b)(4) allows an extension of time upon a finding of "excusable neglect or good cause" "not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b)."  FED. R. APP. P. 4(b)(4).  "Good cause will be found where forces beyond the control of the appellant prevented [him or] her from filing a timely notice of appeal."  *Nicholson*, 467 F.3d at 526 (citation omitted).  Here, counsel says he misunderstood the abeyance of the appeal to mean that this court "would issue an order expanding the record to include the trial court's disposition" of the pending motion.  (Alqsous's Br., p. 12.)  The notice did not suggest that; nor could it.  *See Manrique v. United States*, 137 S. Ct. 1266, 1271 (2017); *see United States v. Shehadeh*, 962 F.3d 1096, 1099 (9th Cir. 2020).  Nothing prevented Alqsous from filing a timely appeal.

Excusable neglect is determined by balancing several factors:  the danger of prejudice to the other party; the length of the delay and potential impact on the proceedings; the reason for the delay, including whether it was within the party's reasonable control; and whether the movant acted in good faith.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993); *see also Stutson v. United States*, 516 U.S. 193, 195-97 (1996) (discussing *Pioneer*'s application in criminal cases).  The district court weighed those factors, finding the most important to be the reason for the delay.  It was not an abuse of discretion to conclude that counsel's purported misapprehension or misunderstanding of Rule 4(b)'s requirements was insufficient to establish excusable neglect.  *See Pioneer*, 507 U.S. at 392 (explaining that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect").

## II.  SUFFICIENCY OF EVIDENCE[6]

Hills, Alqsous, and Al-Madani appeal the denial of their motions for judgment of acquittal, which were made at the close of all the government's proof and renewed after trial.

---

[6]We consider the sufficiency of the evidence independently because a reversal on that ground would preclude retrial.  *See United States v. Nelson*, 725 F.3d 615, 619 (6th Cir. 2013).

*See* FED. R. CRIM. P. 29(c).  When a Rule 29 motion is stated with specificity, all grounds not specified are waived.  *United States v. Hamm*, 952 F.3d 728, 740 (6th Cir. 2020).

A defendant bears a very heavy burden to show that the "judgment is not supported by substantial and competent evidence upon the record as a whole."  *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (citation omitted).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In making this evaluation, we must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict."  *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008) (citation omitted).  Whether the statute of conviction covers the relevant conduct is a legal question that is reviewed de novo.  *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021).

## A.  "Legal Impossibility"

Attacking most of his convictions, Alqsous asserts that the charges should have been dismissed for "legal impossibility" because there was no proof that the *federal government* was the target of the conspiracies.  His reliance on *Tanner v. United States*, 483 U.S. 107 (1987), is misplaced.  *Tanner* held that an electric cooperative receiving federal funds could not be treated as the United States for purposes of a statute prohibiting *conspiracies to defraud the United States* under 18 U.S.C. § 371.  But *Tanner* does not apply to the second class of conspiracies criminalized by § 371—namely, conspiracies to commit offenses created by any statute of the United States.  *See United States v. Gibson*, 881 F.2d 318, 321 (6th Cir. 1989).  Because none of the convictions in this case were for conspiracy *to defraud the United States*, the government was not required to prove that the United States or an agency thereof was an intended victim of the conspiracy.  *Id.*; *see also United States v. Falcone*, 960 F.2d 988, 990 (11th Cir. 1992) (en banc).

## B.  RICO Conspiracy (Count 1)

Hills, Alqsous, and Al-Madani were convicted of conspiracy to violate 18 U.S.C. § 1962(c), which makes it an offense for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *See* 18 U.S.C. § 1962(d).  Notwithstanding Alqsous's assertion to the contrary, it was stipulated at trial that "MetroHealth Hospital Systems, also known as MetroHealth and MetroHealth Dental, were engaged in interstate commerce during the relevant periods [of] the indictment." PageID 15235.  MetroHealth is also an "enterprise," as defined by 18 U.S.C. § 1961(4), and Hills, Alqsous, and Al-Madani are "persons" distinct from that "enterprise," *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162-63 (2001) (holding person who is a corporate owner or employee is distinct from the corporation itself).

Alqsous and Al-Madani argue for the first time on appeal that the RICO conspiracy count is legally insufficient because MetroHealth cannot be both the "enterprise" and the "victim" within the meaning of § 1962(c).  For support, defendants rely on the Third Circuit's holding in *Jaguar Cars* that § 1962(c) reaches only circumstances where officers or employees use the corporate enterprise to victimize others.  *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 266-67 & n.6 (3d Cir. 1995) (discussing *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993), and *NOW, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994)).  The Eleventh Circuit has rejected that reasoning in *Jaguar Cars* as both dictum and an unpersuasive "leap of logic." *United States v. Browne*, 505 F.3d 1229, 1272-73 (11th Cir. 2007) (citation omitted); *see id.* at 1273 (holding Congress intended § 1962(c) to target "'the exploitation and appropriation of legitimate businesses by corrupt individuals,' *not merely the use of an enterprise to swindle third parties*" (emphasis added) (quoting *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000) (en banc))); *see also Cedric Kushner*, 533 U.S. at 164 (noting that RICO protects both a legitimate enterprise from those who would "victimize it" and the public from those who would use an enterprise "as a vehicle" through which illegal activity is committed).

Although the Eleventh Circuit's view seems to represent the better reading of *Reves* and *Scheidler*, this court has yet to confront this issue.  Defendants' failure to raise this as an objection to the indictment or in their Rule 29 motions limits our review to plain error.  *See United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015).  Given the absence of controlling authority and defendants' own description of the issue as one of "unsettled law" and "first impression," defendants cannot demonstrate an error that was "obvious or clear." *See Puckett v.*

*United States*, 556 U.S. 129, 135 (2009) (holding that to be "clear or obvious" an error cannot be "subject to reasonable dispute").

Next, although Hills and Al-Madani assert that at least two RICO predicates were required to prove a "pattern of racketeering activity," a RICO *conspiracy* charge does not require proof that the defendant committed *any* predicate acts. *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005) (citing *Salinas v. United States*, 522 U.S. 52, 63 (1997)).  In fact, a RICO conspiracy does not require proof that a defendant "agreed to commit two predicate acts himself, or even that any overt acts have been committed." *Id.* (citing *Salinas*, 522 U.S. at 63); *see, e.g.*, *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008).  Rather, it is sufficient if the government establishes that a defendant "intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Saadey*, 393 F.3d at 676 (quoting *Salinas*, 522 U.S. at 65).

So, proof of an agreement that at least two predicate acts would be committed by at least one of the coconspirators will suffice. *See United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008).  No formal agreement is necessary, of course, and a RICO conspiracy conviction may be affirmed if the agreement can be inferred from the defendant's actions. *See United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008).  "But when [a defendant] does commit predicate acts, that is sufficient proof that he agreed to commit them." *United States v. Gills*, 702 F. App'x 367, 375 (6th Cir. 2017) (citing *Lawson*, 535 F.3d at 445).  Here, the RICO predicates included more than two conspiracies and several substantive offenses involving racketeering acts of which the defendants were found guilty.  The challenges to those convictions are addressed below, but, when viewed in the light most favorable to the verdict, a rational juror could infer that Alqsous, Al-Madani, and Hills agreed that one or more of them would commit two or more RICO predicate acts.[7]

---

[7]Alqsous argues that an agreement was not proved without showing that the coconspirators were a "continuing unit" or operated with a "common directed purpose." (Alqsous Br., pp. 15-16.)  The authority he relies upon is inapposite, however, because it concerns what is required to prove an association-in-fact enterprise. *See United States v. Turkette*, 452 U.S. 576, 583 (1981); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012).

**C.  Hobbs Act Conspiracy** (Count 2)

The Hobbs Act makes it a crime to, among other things, conspire to obstruct, delay, or affect interstate commerce by extortion, including "obtaining of property from another, with his consent [*i.e.*, not robbery], . . . under color of official right."  18 U.S.C. § 1951(b)(2).  The Supreme Court recognizes "extortion 'under color of official right'" to be "the rough equivalent of what we would now describe as 'taking a bribe.'"  *Ocasio v. United States*, 578 U.S. 282, 296 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 260 (1992)).  All of that is to say, the Hobbs Act makes it a crime for a public official to, directly or indirectly, corruptly demand, seek, receive, accept, or agree to receive or accept anything of value in return for a promise to perform specific official acts.  *Evans*, 504 U.S. at 267-68.  The "thing of value" must be obtained knowing that it was "given in return for official action."  *McDonnell v. United States*, 136 S. Ct. 2355, 2365 (2016) (citation omitted).  But it is not necessary that "the public official in fact intend to perform the 'official act,' so long as he agrees to do so."  *Id*. at 2371.

Hills, Alqsous, and Al-Madani contend that the evidence was insufficient to support their convictions for conspiracy to commit Hobbs Act bribery because:  (1) Hills was not a public official; (2) the "things of value" were merely "gifts" that were not given in return for anything; and (3) even if given in return for something, there was not an agreement to give those things in return for "official acts" as is required under *McDonnell*.  We are not persuaded.

**1.  Public Official.**  Relying on *United States v. Lee*, 919 F.3d 340, 343 (6th Cir. 2019), defendants assert that only *elected* officials are "public officials" for purposes of Hobbs Act bribery.  To be sure, the defendant in *Lee* was an elected member of the County Council.  But nothing in *Lee* suggests that the official act for Hobbs Act bribery (or for that matter Honest Services Fraud) must involve an *elected* public official.  Indeed, the Supreme Court upheld a conviction for conspiracy to commit Hobbs Act bribery in *Ocasio* that involved no elected officials—only Baltimore police officers who received payments in return for steering individuals who were in auto accidents to certain auto repair shop owners.  *Ocasio*, 578 U.S. at 283-84; *see also Dixson v. United States*, 465 U.S. 482, 496 (1984) (holding that non-public employees can be a "public official" when "the person occupies a position of public trust with official federal responsibilities").  Here, Hills was not only an employee of the county-owned

hospital, but he was also the long-serving Chair of the Dental Department and COO of the county-owned hospital. The jury could conclude that Hills was a public official for purposes of this offense.[8]

**2. Bribery.** Ample evidence from multiple witnesses, corroborated by documents and text messages, established that Hills solicited and received from Alqsous, Al-Madani, and Elrawy tens of thousands of dollars in cash, many five-star dinners, use of an apartment and purchase of a computer for a girlfriend, airline tickets, hotel stays, prescription drugs, car repairs, an expensive television, and a $3,600 Louis Vuitton briefcase. Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim.[9]

Indeed, unindicted coconspirator Dr. Hussein Elrawy specifically testified that he, Alqsous, and Al-Madani provided the things of value to Hills in return for promises of favorable employment-related actions. Elrawy explained that Hills took or promised to take favorable action, including: (1) making adjustments to the department's incentive bonuses, which Hills tracked on spreadsheets and discussed over expensive dinners; (2) assigning them high value procedures, such as the first in a series of visits by a denture patient (D1); (3) adopting and maintaining a "flex" scheduling policy under which they received full time pay for fewer than five days of work per week that allowed them to work at their outside private clinics; and (4) creating an additional dental resident position for Lufti Nassar—Alqsous's preferred candidate—when it appeared that Nassar would not be selected for the residency program. Defendants reiterate the reasons why they think Elrawy should not be believed, but it is settled that the credibility of a trial witness is not relevant to our determination of the sufficiency of the evidence to support a conviction. *United States v. Cordero*, 973 F.3d 603, 614 (6th Cir. 2020); *see also Jackson*, 443 U.S. at 319 (explaining that it is for the jury "to resolve conflicts in the testimony,

---

[8]Relatedly, defendants also challenge the jury instruction defining "public official" on the grounds that it should have included only the federal officials listed in the federal bribery statute. *See* 18 U.S.C. § 201(a)(3). Defendants offer no authority to support such a limitation. We easily conclude that the jury was properly instructed, consistent with the pattern jury instruction, that "'public official' means a person with a formal employment relationship with government." PageID 15269; *see* Sixth Circuit Pattern Jury Instruction 17.02(2)(A).

[9]Alqsous challenges this conviction on the grounds that food, drink, car repairs, and prescriptions do not constitute transferrable property under *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (holding "property" does not include coercing someone to recommend an investment). This argument misses the mark—the things of value that Hills solicited and received were not akin to the intangible property at issue in *Sekhar*.

to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Besides, Elrawy's testimony was not the only evidence in that regard.

First, MetroHealth had an incentive bonus program that applied to the Dental Department. A dentist would receive 25% of any amount that was collected for their work in excess of their salary and benefits. As department chair, Hills retained authority to recommend adjustments to those incentive bonuses (up or down) albeit subject to further approval. Elrawy testified that Hills exercised significant discretion over those bonus adjustments and wielded that power over them. Joyce Kennedy, who was romantically involved with Hills and was a beneficiary of some of the things Hills received, described witnessing Hills review spreadsheets and discuss the incentive bonuses over expensive dinners paid for by Alqsous, Al-Madani, and Elrawy. Kennedy and Elrawy both testified that Hills was given envelopes containing thousands of dollars of cash at those dinners—Kennedy added that she counted the money at the table on one occasion and other times she saw Hills step away and return patting his pocket.

Defendants claimed that there were legitimate reasons for some of the upward adjustments, that Hills also made downward adjustments, and that Hills hid the calculations from them so they did not know what additional amounts they were (or were not) getting. Al-Madani would only later discover that Hills had reduced his bonuses as well as increased them. Be that as it may, a reasonable jury could easily conclude that the defendants conspired to solicit and receive things of value in return for acts or promises to act favorably with respect to adjustments to their bonuses.

Second, Hills implemented a "flexible" scheduling policy that allowed Alqsous, Al-Madani, and Elrawy to receive full-time pay for fewer than five days per week of work at MetroHealth. For example, at one point Alqsous's schedule at MetroHealth was all day Wednesday and Friday, and half days on Monday and Saturday (an equivalent of three days). Defendants maintained that there was nothing wrong with this policy because (1) they were still required to work a minimum of 40 hours per week at MetroHealth; (2) they regularly worked more than 40 hours per week anyway; and (3) they were more productive when they were there than if they had worked a five-day, 40-hour week. However, MetroHealth's Chief Medical Officer testified that all full-time doctors (physicians and dentists alike) were expected to work

five days per week in order to earn a full-time salary (FTE 1.0) and that they also typically worked substantially more than 40 hours per week. Nor was this "flex-time" policy disclosed to or approved by MetroHealth as would have been required.

Third, in 2014, Hills intervened directly to ensure that Alqsous's preferred candidate—Lufti Nassar—was accepted into the dental residency program. It had appeared (albeit due to an error in tabulation) that Nassar had not scored high enough in his interview to be ranked for one of the three resident positions. When Nassar was not included in the top three candidates, Alqsous and Al-Madani conferred, Hills was asked to add a fourth position for Nassar, and Hills did so—instructing Elrawy to hire "Sari's boy." The jury could reasonably conclude that Hills was given something of value in return for a promise to intervene when necessary in the resident selection process. It makes no difference that Nassar's corrected score turned out to be the highest of the candidates or that, by all accounts, Nassar turned out to be an excellent resident and dentist.

Nor is there any question that Hills received things of value knowing they were given in return for something. For example, when Hills asked for an expensive television, text messages confirm that the cost was shared between Alqsous, Al-Madani, and Elrawy. When Hills texted Alqsous a message of thanks, Alqsous responded, "You are welcome, boss. You take care of us always." In that same exchange, Hills promised Alqsous a "D-1" bonus, which referred to the lucrative first appointment for a denture patient. Hills also asked Alqsous to provide his girlfriend with the use of an apartment for free in exchange for an increase in Alqsous's bonus by $1,000 per month. When that happened, Alqsous texted his fiancée to tell her that the taxpayers would be would be paying him for the apartment.

Viewed in the light most favorable to the verdict, the evidence was sufficient for a reasonable juror to conclude beyond a reasonable doubt that Hills corruptly demanded and received "things of value" knowing they were given in return for being influenced with respect to the adjustment of the incentive bonuses, favorable case assignments, allowance of the flex-scheduling, and assuring the selection of candidates for the residency program. That brings us to the more technical question of whether the things of value were given in return for "official acts" consistent with *McDonnell v. United States*, 136 S. Ct. 2355 (2016).

**3. Official Act.** In reversing the convictions of Virginia's former governor in *McDonnell*, the Supreme Court narrowed the scope of conduct that constitutes an "official act" for purposes of Hobbs Act bribery (as well as Honest Services Mail and Wire Fraud). *See McDonnell*, 136 S. Ct. at 2364, 2367-68. We recently described what *McDonnell* requires, explaining:

> An "official act" is defined as any "decision or action" on any "question, matter, cause, suit, proceeding or controversy" [that may at any time be] pending [or may be brought] before a public official. *See* 18 U.S.C. § 201. That definition contains a "two-part test." *United States v. Lee*, 919 F.3d 340, 350 (6th Cir. 2019). First, an official act must involve an official issue—a "question, matter, cause, suit, proceeding or controversy." *Id.* (quoting *McDonnell*, 136 S. Ct. at 2368). Second, the public official must have "made a decision or t[aken] an action," or "agreed to do so," on that official issue. *Id.* (quoting *McDonnell*, 136 S. Ct. at 2368).

*Dimora v. United States*, 973 F.3d 496, 502-03 (6th Cir. 2020) (footnote omitted) (granting § 2255 relief on jury instructions issue and remanding for harmless-error review). *McDonnell* held that the former governor's informal actions—setting up a meeting, calling another public official, and hosting an event to help promote a businessman's dietary supplement—did not meet either prong of the "official acts" test. Rather, an official act "involve[s] a formal exercise of governmental power" with respect to something "specific and focused." *McDonnell*, 136 S. Ct. at 2372. And, the words "pending" or "may by law be brought" "suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369. Defendants maintain that the "official acts" test is not met here because the things of value were not given in return for acts, or promises to act, on any particular question or matter involving a formal exercise of governmental power. Their arguments are unavailing.

First, the relevant "question or matter" must involve a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 136 S. Ct. at 2372. But as *McDonnell* itself illustrates, this depends on how the pending "question" or "matter" is framed. There, the governor's general interest in promoting business or economic development simply was not a question or matter involving a formal exercise of governmental power. Tellingly, however, the

Court also explained that other questions or matters would meet the requirement: namely, (1) whether a state university would initiate a study of the supplement; (2) whether a state-created commission would grant money for a study of the supplement; and (3) whether the health insurance plan for state employees would pay for the supplement. *Id*. at 2369-70.

A similar issue was addressed in *Van Buren*, where the Eleventh Circuit rejected a challenge to the sufficiency of the evidence but found instructional error. *See United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019), *rev'd on other grounds*, 141 S. Ct. 1648 (2021). Van Buren was a police officer convicted of honest services fraud for taking money to conduct an improper license-plate search on behalf of someone who said he wanted to find out whether a woman he met at a strip club was an undercover officer. The court held that whether to provide such information was not comparable to a lawsuit, hearing, or administrative determination. *Id*. at 1203-04. That is, "[m]erely divulging information to a civilian" is not an exercise of governmental power similar to the three questions or matters that *McDonnell* explained would satisfy the requirement. *Id*. at 1204.

The problem in *Van Buren* was how the government had identified the pending question or matter. *Id*. at 1205. Van Buren had confessed to running the license plate search in return for money and admitted that he knew the purpose of the request was to discover whether someone at a strip club was an undercover officer. (It did not matter that it actually was a sting operation.) That admission would have met the official act requirement "[i]f the government had identified the underlying matter as something like an investigation into illegal activity, such as prostitution, at the strip club." *Id*. "Such an investigation would have been a specific, formal government action, within the ambit of police activity, that is comparable to a lawsuit, hearing, or administrative determination" and that could be "put on an agenda, tracked for progress, and marked off as complete." *Id*. It would also be a matter that Van Buren could have "acted *on*." *Id*.

Here, the official issue—the pending "question, matter, cause, suit, proceeding or controversy"—may be identified as whether to allow flex-time schedules, make adjustments to incentive bonuses, and/or increase the number of dental residents in the dental department of a public hospital. These were pending matters that could be put on an agenda, tracked for

progress, and marked off as complete.  Nor have defendants offered any authority establishing that such decisions or actions would not be an exercise of governmental power on a "question, matter, cause, suit, proceeding or controversy."  *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)); *see United States v. Henderson*, 2 F.4th 593, 595 (6th Cir. 2021) (affirming Hobbs Act bribery conviction of a guard who smuggled contraband into a county jail for money and failed to report the prison violation as required); *see also id.* at 600 (Rogers, J., concurring) (cautioning against construing the decision "as always requiring something like a potential hearing" and emphasizing that it was not necessary to decide "just how narrowly the 'question' or 'matter' requirement should be construed").

Second, the official must make a decision or take action, or promise to do so, on the particular question or matter *at the time* he receives payment or other things of value. *McDonnell*, 136 S. Ct. at 2374; *see also Evans*, 504 U.S. at 268.  Relying on the Second Circuit's decision in *Silver*, Alqsous argues that *McDonnell* invalidated all "stream of benefits" or "as opportunities arise" theories of Hobbs Act bribery.  *See United States v. Silver*, 948 F.3d 538, 556 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021).  However, as the Second Circuit itself explained, *McDonnell* did not invalidate all "as opportunities arise" bribery—only convictions for bribery schemes that are akin to payment of a retainer for services yet to be determined.  *See United States v. Skelos*, 988 F.3d 645, 655-56 (2d Cir. 2021); *Silver*, 948 F.3d at 553 n.7 (describing bribes that are akin to a retainer to be bribes accepted for a promise to perform acts to be designated at a later date).  It is sufficient if the official promises to make a decision or take action on a particular question or matter "as the opportunity to influence that same question or matter arises." *Silver*, 948 F.3d at 552-53.  This case is not like *Dimora*, where a network of so-called sponsors provided gifts to Dimora in the expectation that he would use his influence in their favor on matters not yet specified.  *See Dimora*, 973 F.3d at 500.

The district court did not err in rejecting the defendants' challenges to the sufficiency of the evidence to support their convictions on Count 2.

**D.  Dental Resident Bribery Scheme** (Counts 3, 4, 5-7)

The jury found Alqsous, Al-Madani, and Sayegh guilty of two conspiracies: (1) Conspiracy to Commit Bribery Concerning a Program Receiving Federal Funds, in violation of 18 U.S.C. §§ 371 and 666(a)(1)(B) and (a)(2); and (2) Conspiracy to Commit Honest Services Mail or Wire Fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349 (Counts 3 and 4).  Alqsous and Sayegh were convicted of one substantive count of federal-program bribery (Count 5), while Al-Madani and Sayegh were convicted of two other substantive counts of federal-program bribery (Counts 6 and 7).[10]

**1. Conspiracy Counts.**  Both conspiracies required proof that two or more people agreed to commit the substantive offense; that the defendant knowingly and voluntarily joined the conspiracy; and, only in the case of the § 371 conspiracy, that a coconspirator committed an overt act in furtherance of the conspiracy.  *See United States v. Rogers*, 769 F.3d 372, 377, 380-82 (6th Cir. 2014).

For conspiracy to commit honest services mail or wire fraud, the scheme must involve bribery or kickbacks (Count 3).  *See Skilling v. United States*, 561 U.S. 358, 409-10 (2010).  That, in turn, requires proof that the bribe was solicited in return for an "official act" within the meaning of *McDonnell*.  *See Lee*, 919 F.3d at 355-56.  It is not necessary to prove that any official action was taken, as long as there is evidence that there was a promise to take official action in return for the bribe.  *Id*. at 356.  Here, a reasonable jury could infer an agreement to solicit and/or receive payment in return for promises to take official action with respect to the particular question or matter of admission to the dental residency program of a public hospital.[11]

Ample evidence established that four foreign-born dentists were solicited and all but one paid bribes in order to secure admission into MetroHealth's dental residency program.  As the testimony showed, MetroHealth's residency program was unusually attractive because it

---

[10]Recall that Alqsous was acquitted on Counts 6 and 7, and that Hills was not charged with any offenses related to the dental resident bribery scheme.

[11]Despite defendants' assertions to the contrary, *McDonnell*'s "official act" requirement does not apply to the federal-program bribery offenses.  *United States v. Porter*, 886 F.3d 562, 565-66 (6th Cir. 2018); *see also United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021), *cert. denied*, _ S. Ct. _, 2022 WL 515872 (Feb. 22, 2022).

provided its residents with a salary rather than charging them tuition. In 2008, while a resident himself, Alqsous solicited a bribe from a dentist he knew from Jordan who was applying to the residency program. That dentist—Dr. Ahmad AlSaad—testified that Alqsous told him he would be accepted in return for a "donation" of $20,000. Alqsous assured him by email that he would get in and provided a personal bank account number so AlSaad could wire him the money. AlSaad agreed to pay in increments of $5,000. He made the first payment in November 2008, the second payment after his interview in December 2008, and the third payment after he was accepted in March 2009. For the last installment in late 2009, Alqsous told AlSaad to make the payment to Sayegh.

Two other Jordanian dentists paid bribes to get into the residency program during the 2010-2011 application cycle. Dr. Yazan Karadsheh testified that he stayed with Sayegh while visiting Cleveland for his interview and socialized with Sayegh, Alqsous, and Al-Madani. Sayegh told Karadsheh that a sizeable "contribution" would increase his chances of getting in, and Karadsheh agreed to pay $10,000. Karadsheh testified that his father paid Sayegh's brother in Jordan. Then, before the official announcement, Al-Madani used Facebook Messenger to let Karadsheh know he had been accepted. Karadsheh said that during his residency, Sayegh told him to "be better" with Alqsous because "he's the one who got you into the program." And, in 2014, after the investigation had started at MetroHealth, Al-Madani called Karadsheh and warned him not to talk with anybody because Karadsheh could get deported.

Similarly, Dr. Firas Yacoub testified that he socialized with Alqsous, Al-Madani, and Sayegh when he visited Cleveland for his interview. Yacoub had a close friend who was related to Al-Madani. Sayegh called Yacoub in Jordan, explained how competitive the program was, and solicited a $20,000 bribe from him to secure a position. Sayegh told Yacoub that if he gave the "donation" "to a group of people that are associated with the hospital," they could support his application. Yacoub agreed to pay Sayegh in installments and was accepted into the program.

Lastly, a bribe was solicited from Dr. Issa Salemeh, a dentist in Cleveland who had asked if Alqsous and Sayegh would give his sister, Seim Salemeh, a positive recommendation in support of her application to the residency program. After one social gathering that included Alqsous and Al-Madani, Sayegh told Issa Salemeh to talk to Alqsous about a recommendation.

Issa testified that Alqsous told him he would "have to pay $25,000 to my boss to guarantee the process for her." But Alqsous later reduced the amount, telling Issa that he had "contacted his boss" and that Issa would only have to pay $20,000 because he was "a good friend." No payment was made and Seim Salemeh was accepted into the program anyway, although Alqsous continued to ask her for money. Elrawy testified that when he heard that Alqsous had solicited a bribe from Seim Salemeh, Elrawy reported it to Hills and Hills said he would "take care of that." Instead, Alqsous approached Elrawy and offered Elrawy $5,000 to stay quiet. Alqsous also told Elrawy that he paid Hills a "down payment" from the bribe.

There can be no doubt that the evidence was sufficient to establish that Alqsous and Al-Madani conspired to commit the substantive offenses of federal-program bribery and honest services mail or wire fraud. The jury could infer the agreement from evidence that Alqsous and Sayegh solicited bribes for promises of admission to the residency program; that Alqsous directed one resident to make his final payment to Sayegh; that Yacoub was told the donation went to a "group of people associated with the hospital"; that Sayegh told Karadsheh that Alqsous was the one who got him into the program; and that Al-Madani participated in the interviews, sent early notification to Karadsheh, and warned Karadsheh to keep quiet. And, after Elrawy told Hills that he heard that Alqsous had solicited a bribe from a resident, Alqsous offered Elrawy $5,000 not to say anything. Nor does Alqsous's acquittal on two of the substantive counts undermine the jury's finding that he knowingly and voluntarily joined the conspiracies.

**2. Substantive Offenses.** A conviction for federal-program bribery under § 666(a)(1)(B) requires proof that the defendant: (1) was an agent of an organization that received more than $10,000 annually in federal funds; (2) corruptly solicited or demanded for the benefit of any person or accepted, or agreed to accept anything of value; and (3) acted with intent to be influenced or rewarded in connection with a transaction or business of the organization that

involved property or services worth $5,000 or more. *See United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018); 18 U.S.C. § 666(a)-(b).**12**

There is no dispute that MetroHealth received more than $10,000 in federal funds annually. And, as employees of MetroHealth Dental, defendants were agents as that term is defined by 18 U.S.C. § 666(d)(1). To corruptly solicit or accept anything of value means that it was done with "intent to give some advantage inconsistent with official duty and the rights of others." *United States v. Buendia*, 907 F.3d 399, 402 (6th Cir. 2018) (citation omitted). Subversion of the admission process for the residency program is inconsistent with official duty and the rights of others—that is so even if AlSaad, Karadsheh, Yacoub, and Salemeh were also all worthy candidates for the dental residency program. (Indeed, Salemeh was admitted to the program without paying any bribe.)

Alqsous argues that the evidence was insufficient to establish his specific intent to "corruptly solicit" a bribe to guarantee favorable treatment for Seim Salemeh's application (Count 5). This claim is without merit as a reasonable jury could conclude that he did. Alqsous also disputes that the transaction was worth at least $5,000. Although 18 U.S.C. § 666(c) exempts bona fide salary or compensation paid in the usual course of business, the value of the pertinent transaction is determined by the amount solicited. *See United States v. Mills*, 140 F.3d 630, 632-33 (6th Cir. 1998). Here, that amount was well above $5,000.

Al-Madani was convicted (along with Sayegh) of federal-program bribery in connection with the bribes that were paid by Karadsheh and Yacoub (Counts 6 and 7). It is true that Al-Madani did not personally solicit or accept the bribes himself, although Sayegh did. The government relies on both aiding and abetting theory and *Pinkerton* liability, but we need look no further than the latter to reject this sufficiency-of-the-evidence claim. *Pinkerton* liability "allows members of a conspiracy to be held liable for reasonably foreseeable substantive offenses committed by coconspirators in furtherance of the conspiracy." *United States v. Woods*, 14 F.4th 544, 552 (6th Cir. 2021) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946)). That is, a defendant may be convicted as a principal even if he did not participate in the

---

**12**Defendants have abandoned the argument that it was necessary to show impairment to the federal funds, which is foreclosed by *Sabri v. United States*, 541 U.S. 600, 605 (2004).

offense if: it was "done in furtherance of the conspiracy," it "fall[s] within the scope of the unlawful project," and it is a "reasonably foreseeable" consequence of the conspiracy. *United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020) (quoting *Pinkerton*, 328 U.S. at 647-48). The jury had sufficient evidence to conclude that the bribes solicited from and paid by Karadsheh and Yacoub satisfied those requirements.[13]

**E. Oral Health Enrichment Scheme** (Counts 8, 9-12)

Hills, Alqsous, and Al-Madani were each convicted of Conspiracy to Commit Money and Property Mail and Wire Fraud in connection with this scheme, but only Hills was convicted of the four substantive counts of Money and Property Mail and Wire Fraud. *See* 18 U.S.C. §§ 1343 and 1349.

A rough outline of this conspiracy will suffice. Hills, who had been a member of the Ohio State Dental Board, opened Ohio Health Enrichment (OHE) with business partner and former paramour Julie Solooki to provide retraining for dentists who needed to cure disciplinary or performance issues. They were assisted by the Board's Executive Director, Lili Reitz, who had a relationship with Hills and attended conferences and facilitated referrals of clients to OHE. OHE operated from a small office and had no clinical facilities of its own, although OHE marketed itself as having an association with a major Midwest medical system. In fact, a brochure for OHE used photographs from inside MetroHealth even though it did not have an agreement to use MetroHealth's facilities. Solooki testified that OHE had hundreds of clients, about 20% of whom sought clinical training and/or testing. In those cases, Hills had Solooki schedule the clinical work using MetroHealth's facilities and staff. Those clients were supervised mostly by Alqsous, once or twice by Al-Madani, and also by Elrawy, Butriy, and Hills. OHE did not pay anything to them or to MetroHealth for those services.

---

[13]Al-Madani's later warning for Karadsheh to "stay quiet" was relevant to the bribery (and obstruction of justice) conspiracies. But *Rosemond* clarified that "a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission. An intent to advance some different or lesser offense is not, or at least not usually, sufficient." *Rosemond v. United States*, 572 U.S. 65, 76 (2014) (citation omitted). The after-the-fact warning to Karadsheh could not be the basis for Al-Madani's conviction on the substantive federal-program bribery counts as an aider and abettor.

Defendants attempt to minimize the use of MetroHealth's facilities and staff, emphasizing that one client's exam only took ten or fifteen minutes and that another OHE client was in the clinic for a few hours but did not interfere with MetroHealth's operation. The jury was entitled to credit testimony that each dental chair typically generated daily revenue of $3,000 to $6,000; that OHE clients used MetroHealth's facilities during clinic hours; and that OHE clients required the time of MetroHealth staff and dentists during the training and testing. Specific evidence was offered about nine clients who contracted for OHE's services and received clinical remediation or testing using MetroHealth's facilities and staff. (Hills Br., pp. 25-26.) Those nine clients were charged a total of $111,900 (including itemized charges for clinical services for six of them totaling $13,000). There was also testimony that OHE's written materials were copied from books in MetroHealth's library and that MetroHealth's residents helped to write test questions for OHE's clients. A reasonable jury could conclude that the defendants conspired to defraud MetroHealth of property by using its facilities and staff to further OHE's separate business. Hills has not challenged the related substantive mail fraud convictions.[14]

**F. Patient Referral Kickback Scheme** (Counts 13, 14-20, 21-27, 28)

Hills, Alqsous, and Al-Madani were each convicted of: (1) Conspiracy to Commit Honest Services and Money and Property Mail Fraud, in violation of 18 U.S.C. § 1349 (Count 28); and (2) Conspiracy to Solicit or Receive "any remuneration" "in return for referring an individual . . . for . . . service for which payment may be made in whole or part under a Federal health care program," in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)(A) (Count 13). Seven checks written to Hills formed the basis of the substantive convictions of Hills for *receipt* of health care kickbacks (Counts 14-20), and of Alqsous and Al-Madani for *payment* of health care kickbacks (Counts 21-27). *See* 42 U.S.C. § 1320a-7b(b)(1)(A) and (2)(A).

---

[14]Alqsous directs us to *Kelly v. United States*, 140 S. Ct. 1565 (2020), which reversed the convictions of two public officials who used their regulatory power to close lanes of a bridge to exact political retribution on behalf of then Governor Chris Christie ("Bridgegate"). In fact, *Kelly* contrasted incidental costs that were a byproduct of the lane closures from cases where property was an object of the fraud. *Id*. at 1573 ("A government's right to its employees' time and labor, by contrast, can undergird a property fraud prosecution."). *Kelly* has no application here.

MetroHealth had a policy and practice against referring patients to private clinics except when MetroHealth did not provide a needed service, although Hills retained authority to refer patients on an ad hoc basis. According to Elrawy, Hills proposed a patient referral kickback scheme over dinner with him, Alqsous, and Al-Madani in early 2014. Hills suggested that they could pick from MetroHealth patients, refer those patients to their respective private clinics, and split the money three ways (with Hills getting a third). Elrawy testified that he, Alqsous, and Al-Madani rejected the idea on the spot because they knew it could get them fired. They also talked among themselves later and agreed that it would be a "money loser" given the "split" Hills had proposed. There was evidence that they all had reason to know from required annual training that this scheme would be illegal. As it turned out, Hills, Alqsous, and Al-Madani did it anyway.[15]

The first check to Hills was written in January 2014. In February 2014, Alqsous and Al-Madani sent a draft referral form to Hills and messaged each other about discussing it with him. On March 14, 2014, Hills called an all-department meeting and announced that MetroHealth would begin referring patients to Buckeye Dental—a private clinic owned by Alqsous and Al-Madani. Elrawy spoke with Alqsous, who said he was going to meet with Hills to discuss how much they would pay him for each patient referral. Alqsous told Elrawy that Hills was asking $100 per referral. Elrawy also discussed the referrals with Hills, who said "Sari will take care of me." Karadsheh testified that he discussed the referrals with Al-Madani, and Al-Madani said "there is nothing for free" with Hills. Karadsheh's wife also reported hearing Al-Madani say he gave Hills a "big fat check" for Buckeye.

Text messages and financial records showed that Hills received seven monthly checks from Noble Dental Clinic starting in January 2014 and ending in July 2014 (after MetroHealth contacted the FBI). Those checks were deposited into Hills's accounts, and Alqsous and Al-Madani had a 1099 form mailed to Hills for the total of $17,600. Although the checks bore the notation "consulting fees," a reasonable jury could conclude that they were kickbacks to Hills for patient referrals to Buckeye Dental. That is true notwithstanding evidence that MetroHealth experienced overcrowding, long wait times, and greater patient complaints after the adoption of a

---

[15]Elrawy operated a private clinic called Angel Dental.

program for Medicaid-eligible patients increased the number of patients by 22%. Defendants are correct that it is not illegal to refer patients elsewhere for needed care—but it is illegal to do so in return for kickbacks. There was ample evidence to support the jury's finding that Hills, Alqsous, and Al-Madani intended to solicit and pay kickbacks for those patient referrals. The fact that Hills allowed referrals only to Buckeye adds further support to that conclusion.

Conspiracy to commit honest services mail or wire fraud is limited to schemes involving bribes or kickbacks (Count 28). *See Skilling*, 561 U.S. at 409-10. Honest services fraud (like Hobbs Act bribery) requires proof that the bribe or kickback was solicited in exchange for an "official act." *Lee*, 919 F.3d at 355-56. That requirement is specific to the charge at issue. Here, the particular question or matter involving a formal exercise of governmental power was whether to authorize a diversion of patients from the county hospital to a privately owned clinic. The evidence was sufficient to establish a conspiracy to solicit and receive kickbacks in return for Hills's official act, or promise to act, to allow the referral of MetroHealth's patients to Buckeye Dental.

The health care kickback conspiracy required proof of an agreement to knowingly and willfully solicit, receive, offer, or pay kickbacks to Hills in return for the referral of patients to Buckeye (Count 13). Because this conspiracy is charged under 18 U.S.C. § 371, proof of an overt act was also required. There can be no question that an overt act was committed by at least one member of the conspiracy. As for proof that the referrals were for services for which payment may be made under a federal health care program, defendants stipulated that Ohio's Medicaid program is a federal health care program. There was evidence that 75% of MetroHealth's patients were covered by Medicare or Medicaid. More than 100 MetroHealth patients were referred to Buckeye for dental work after the policy change in March 2014, and the referrals to Buckeye were tracked and reported to Hills's personal assistant. The jury could reasonably infer that the defendants solicited, received, and paid kickbacks for referrals of patients for services that may be payable under a federal health care program. The evidence is likewise sufficient to support the substantive convictions of Hills for receipt of, and of Alqsous

and Al-Madani for payment of, such kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and (b)(2)(A).**16**

**G.  Obstruction of Justice Scheme** (Counts 29, 30)

    **1.  Conspiracy to Obstruct Justice.**  Hills, Alqsous, and Al-Madani were convicted of conspiring to obstruct justice in one or more ways, in violation of 18 U.S.C. § 1512(k), (b)(1), (b)(3), (c)(2) and (d).  Each defendant must have knowingly joined the conspiracy to obstruct justice with respect to the investigation into their activities with MetroHealth.

    Elrawy testified about more than one dinner meeting where the FBI's investigation was discussed.  Defendants argue that those discussions involved nothing more than encouraging each other to assert their constitutionally protected Fifth Amendment rights.  *See United States v. Farrell*, 126 F.3d 484, 488-89 (3d Cir. 1997).  Elrawy, who had agreed to cooperate with the government, surreptitiously recorded a dinner meeting with Hills, Alqsous, and Al-Madani in November 2014—when the FBI's investigation was about six months old.  On that occasion, Hills told them to "stick together" and not to talk to the FBI.  Alqsous insisted that he had not told anyone—including his fiancée—so "none of you guys will get in trouble."  Hills also told them, "you all need to work like a cartel, understand the business, you guys will be great, but do it legally.  How many times have I told you guys sitting right here you're never bigger than the game."  The fact that Hills said to "do it legally" did not negate other evidence of the defendants' corrupt intent or that they each knowingly joined the conspiracy to obstruct the FBI's investigation.

    In particular, Elrawy testified that Hills instructed him to "downplay" the resident bribery scheme, to tell the FBI that none of the referred patients were on Medicaid, and to lie about the big-screen TV he received from them.  Al-Madani warned Karadsheh to stay quiet about the bribe he had paid or risk deportation.  Before Joyce Kennedy appeared before the grand jury, Hills told her to "just forget about" the envelopes of cash she had seen.  Alqsous and Al-Madani had a 1099 prepared for the checks from Noble that was sent to Hills in 2015, although Hills did

---

**16**Defendants argued for dismissal of these counts because the indictment also identified four Medicaid checks as overt acts in furtherance of these conspiracies.  No error can be shown, however, because no evidence was offered about those checks at trial and reference to them was omitted from the jury instructions.

not send it on until after his accountant was subpoenaed in February 2016. There was sufficient evidence, if believed, for a jury to find that the defendants conspired to obstruct justice by discouraging each other from cooperating with the FBI, attempting to influence what might be said to law enforcement, and attempting to influence testimony before the grand jury.[17]

**2. False Statement.** Al-Madani was convicted of willfully making a materially false statement to a federal agent by stating that the funds paid to Hills were a "finder's fee." *See* 18 U.S.C. § 1001(a)(2). This offense required proof that Al-Madani made a statement that was false and material, that the defendant acted knowingly and willfully, and that the statement pertained to a matter within the jurisdiction of a federal agency. *United States v. Geisen*, 612 F.3d 471, 489 (6th Cir. 2010); *see also* Sixth Circuit Pattern Jury Instruction 13.02. Al-Madani claims this conviction was not supported by sufficient evidence because his statements were equivocal, qualified, and not material. This contention is without merit.

FBI Agent Roth testified that Al-Madani was interviewed outside his residence on September 29, 2015. Asked about Noble Dental Clinic, Al-Madani confirmed that he owned it with Alqsous; relayed that Hills had helped them find it; and said that "there was a finder's fee paid to [Dr.] Hills for his assistance." According to Agent Roth, Al-Madani told the agents that he thought the money for the finder's fee came from Noble, but said he was sure that it did not come from Buckeye. Al-Madani said he did not look at Noble's financial records in detail and provided the name of the accountant. All this showed, however, was Al-Madani's uncertainty about the *source* of the funds—not the reason for the payments. The false statement was material to the investigation of the patient referral kickbacks, and the jury could reasonably conclude beyond a reasonable doubt that Al-Madani made the false statement knowingly and willfully. *See United States v. Lee*, 359 F.3d 412, 417 (6th Cir. 2004) (holding "false declaration satisfies the materiality requirement if a truthful statement might have assisted or influenced the . . . investigation").

---

[17]The government presented evidence that Hills used his influence with Reitz to get confidential information from the Dental Board and had an attorney send "cease and desist" letters to someone he was led to believe was the source of a tip to the Board about the FBI's investigation of him and MetroHealth. It is not obvious whether the letters were intended to interfere with communications to law enforcement or testimony in an official proceeding. But the government need not (and does not) rely on that incident to prove conspiracy to obstruct justice. No substantive offense related to that evidence was charged either.

For the reasons discussed, we find the evidence, viewed in the light most favorable to government, was sufficient to support each of the challenged convictions.

### III.  OTHER TRIAL ERRORS

#### A.  Multiplicity

An indictment generally "may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause.'" *United States v. Davis*, 306 F.3d 398, 417 (6th Cir. 2002) (citation omitted).  This is generally determined by asking "whether each provision requires proof of a fact which the other does not." *Id*. (citation omitted); *see also United States v. Patel*, 694 F. App'x 991, 994 (6th Cir. 2017).

Alqsous asserts that some of the counts are multiplicitous and argues that a single scheme of health care fraud was impermissibly charged in multiple counts.  (Alqsous Br., p. 62 & n.22.)  Alqsous sheds no more light on this claim in reply, stating only that Counts 3 and 13, Counts 4, 8, and 29, and Counts 21 through 27 are multiplicitous.  Because Alqsous has not attempted the necessary comparison of the elements, this claim is forfeited.  *See United States v. Bradley*, 917 F.3d 493, 509 (6th Cir. 2019) (finding argument forfeited where it was "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citation omitted)); *United States v. Hart*, 70 F.3d 854, 859-60 (6th Cir. 1995).[18]

#### B.  Presence During Charge Conference

Alqsous complains that the jury charge conference was conducted with defense counsel but without the presence of the defendant himself.  The record reflects that the district court began discussions concerning the jury instructions on a Friday afternoon, continued work over the weekend, and concluded with changes made as late as the following Monday morning.

---

[18]Notably, because this claim was not raised in a pretrial motion challenging the indictment, our review would be for plain error.  *See Davis*, 306 F.3d at 416-17.

Objections to the final instructions were addressed on the record, but no objection was made to Alqsous's absence from the charge conference then or at any time during or after trial.**19**

"[T]he right to be present at the critical stages of trial is rooted in the Due Process Clause (Fifth Amendment) and the Confrontation Clause (Sixth Amendment), and has been codified in Rule 43 of the Federal Rules of Criminal Procedure." *United States v. Taylor*, 489 F. App'x 34, 43 (6th Cir. 2012) (citing *United States v. Gagnon*, 470 U.S. 522, 526-27 (1985)). When, as here, a defendant is not actually confronting witnesses or evidence against him, a defendant has a due process right to be present "when 'his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *United States v. Henderson*, 626 F.3d 326, 343 (6th Cir. 2010) (citation omitted). Alqsous argues that important legal issues were discussed, but does not suggest how his absence could have detracted from his defense since he was represented by counsel during those discussions. *See, e.g.*, *United States v. Beierle*, 810 F.3d 1193, 1198-99 (10th Cir. 2016) (finding no due process right to attend jury instruction conference).

Nor does Rule 43 confer a right to attend a conference between the court and counsel concerning the legal matter of the instructions to be given to the jury. Rule 43 provides a right to be present at every stage of the trial, but a defendant need not be present when a "proceeding involves only a conference or hearing on a question of law." FED. R. CRIM. P. 43(a), (b)(3). Every other circuit to address the issue has held that a jury instruction conference comes within that exception. *See United States v. Thornton*, 609 F.3d 373, 376 (6th Cir. 2010) (citing cases); *see also Taylor*, 489 F. App'x at 44-45. Alqsous has not demonstrated that the district court erred, much less plainly erred, by conducting a jury charge conference with counsel but without the defendant. *See United States v. Romero*, 282 F.3d 683, 689-90 (9th Cir. 2002) (holding a defendant has no constitutional or statutory right to attend a conference between the court and counsel to discuss jury instructions). Moreover, the right to be present under Rule 43 is waived if not affirmatively asserted. *Gagnon*, 470 U.S. at 528; *see also United States v. McCoy*, 8 F.3d 495, 497 (7th Cir. 1993).

---

**19**A minute entry reflects that a five hour and fifteen minute conference regarding jury instructions was held with counsel in chambers on Friday, July 20, 2018.

**C.  Jury Instructions**

When a defendant has preserved an objection to a jury instruction, we must determine "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (citation omitted); *see also Jones v. United States*, 527 U.S. 373, 391 (1999).  The legal accuracy of the instructions are reviewed de novo, while the refusal to give a requested instruction is reviewed for abuse of discretion.  *United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020).  We "may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading, and prejudicial." *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011) (quoting *United States v. Young*, 553 F.3d 1035, 1050 (6th Cir. 2009)).

**1. "Official Act" Instruction.** Defendants argue that the district court's "official act" instruction failed to fully embrace the requirements of *McDonnell*.  The record indicates that some objections were lodged with respect to this instruction, although the instruction related only to the conspiracies to commit Hobbs Act bribery and Honest Services Mail or Wire Fraud (Counts 2, 4, and 28).[20]

Defendants argue that the instruction was flawed for the same reasons as in *Van Buren*. Recall that *Van Buren* involved a police officer who took money in return for improperly checking a license plate to see if someone was an undercover officer.  The Eleventh Circuit found the jury instruction was "over inclusive" because (1) it stated that the official must have acted "on a question or matter" without including the rest of the statutory definition ("cause, suit, proceeding or controversy"); and (2) it did not instruct that the formal exercise of governmental power be "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Van Buren*, 940 F.3d at 1200-02.  Here, however, the jury was instructed that "the evidence must show a question, matter, cause, suit, proceeding, or controversy that may at any time be pending or may by law be brought before a public official." PageID 15270.

---

[20]There is no "official act" requirement for money and property mail or wire fraud, *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997), or bribery concerning a federal program, *United States v. Porter*, 886 F.3d 562, 565-66 (6th Cir. 2018).

As for the "similar in nature" qualification, it is not clear from the record whether it was specifically requested by any of the defendants.  Assuming that it was, we may reverse for failure to give a requested instruction "only if the instruction is (1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantially impairs defendant's defense." *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (quoting *United States v. Sassak*, 881 F.2d 276, 279 (6th Cir. 1989)).  Defendants cannot make this showing.  Notably, the Eleventh Circuit has recently held that it was *not* an abuse of discretion to refuse to include this "similar in nature" qualification in *United States v. Mayweather*, 991 F.3d 1163, 1183-84 (11th Cir. 2021).  As the court explained there, adding the "similar in nature" qualification could make the instructions misleading "because formal exercises of governmental power similar to—but other than—'a  lawsuit before court, a determination before an agency, or a hearing before committee,' can qualify as a 'question, matter, cause, suit, proceeding, or controversy.'" *Id*. at 1184.

Nor has this court required it.  In *Dimora*, we described three clarifying instructions that *McDonnell* requires "to prevent a jury from convicting the defendant for lawful conduct." *Dimora*, 973 F.3d at 503.  The jury instruction given in this case included all three by:  (1) requiring the jury to "identify a 'question, matter, cause, suit, proceeding or controversy' *involving the formal exercise of governmental power*"; (2) instructing that "the pertinent question, matter, cause, suit, proceeding or controversy must be something specific and focused that is 'pending' or 'may by law be brought' before any public official"; and (3) instructing that "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id*. (quoting *McDonnell*, 136 S. Ct. at 2374-75).  Defendants have not demonstrated it would be error to deny a request for the "similar in nature" language in this case.[21]

Next, defendants contend that the instruction was over inclusive because it allowed the jury to convict on an "as the opportunities arise" theory.  *McDonnell* does not require

---

[21]The instructions in *Dimora* were found wanting because they defined "official acts as any 'actions generally expected of the public official' including the 'exercise of . . . *informal* official influence' over other public officials." *Dimora*, 973 F.3d at 504 (emphasis added).

"identification of a particular *act* of influence," only "identification of a particular *question or matter* to be influenced." *United States v. Silver*, 948 F.3d 538, 552 (2d Cir. 2020). The error in *Silver* was that the instructions permitted the jury to convict on "an open-ended promise to perform official actions for the benefit of the payor." *Id.* at 559; *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (finding error where the jury was not required to find that "at the time the defendant accepted the relevant payment, he understood he was expected 'to take official action on a *specific and focused question or matter* as the opportunities to take such action arose'").

Here, the jury was instructed that the government need not prove "which payments controlled particular official acts or that each payment was tied to a specific official act; rather, it is sufficient if the public official understood that he was expected to exercise some influence on the payor's behalf as opportunities arose." PageID 15271-72; *see* Sixth Circuit Pattern Jury Instruction 17.02(3)(C). Unlike in *Silver*, the jury was also instructed that the second part of the "official act" test requires that "the government must prove that the public official made a decision or took an action *on that question or matter or agreed to do so*." PageID 15270 (emphasis added). As such, the "official act" instruction in this case did not permit the jury to convict based only on an open-ended promise to perform unspecified future acts for the benefit of the payor. The "official act" instruction stated the law with substantial accuracy consistent with *McDonnell* and *Dimora*, and was not "confusing, misleading, and prejudicial." *Fisher*, 648 F.3d at 447.

**2. "Overt Act" Instruction.** For the § 371 conspiracies charged in Counts 3 and 13, the jury was properly instructed that it had to find at least one coconspirator committed an overt act in furtherance of the conspiracy. Defendants requested that an overt act instruction be given for the charge of Conspiracy to Commit Hobbs Act bribery as well (Count 2). Reviewing the legal accuracy of the instruction de novo, we find no error. *See Pritchard*, 964 F.3d at 522.

Hills and Al-Madani argue that the district court was bound by the older of two seemingly inconsistent decisions of this court, each of which makes passing reference to the elements of a conspiracy to violate the Hobbs Act. *Compare United States v. Benton*, 852 F.2d 1456, 1465 (6th Cir. 1988) (noting that proof of an overt act is required); *with United States v.*

*Shelton*, 573 F.2d 917, 919 (6th Cir. 1978) (comparing Hobbs Act conspiracy and Hobbs Act extortion without mention of an overt act requirement).  We need not tangle with whether either represents a binding holding on the issue because subsequent Supreme Court precedent clearly dictates the result.  *See Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019); *Darrah v. City of Oak Park*, 255 F.3d 301, 309-10 (6th Cir. 2001).

In short:  "The United States Supreme Court and the Sixth Circuit's Pattern Criminal Jury Instructions both recognize that juries need not find proof of an overt act in a conspiracy charged under a statute [that] does not list an overt act as an element of the offense."  *United States v. Rogers*, 769 F.3d 372, 382 (6th Cir. 2014) (holding that overt act instruction is not required for conspiracy to commit wire fraud under 18 U.S.C. § 1349).  We explained in *Rogers* that the result was dictated by the Supreme Court's decisions in *Whitfield*, *Salinas*, and *Shabani*.  *Id.* at 381 (citing *Whitfield v. United States*, 543 U.S. 209, 219 (2005) (money laundering conspiracy under 18 U.S.C. § 1956(h)), *Salinas v. United States*, 522 U.S. 52, 63 (1997) (RICO conspiracy under 18 U.S.C. § 1962(d)), and *United States v. Shabani*, 513 U.S. 10, 17 (1994) (drug conspiracy under 21 U.S.C. § 846)).  Because that analysis applies with equal force to conspiracy to commit Hobbs Act bribery, the district court did not err in refusing to instruct that proof of an overt act was required.  *See United States v. Jett*, 908 F.3d 252, 264-65 (7th Cir. 2018) (citing cases).

**3. "Good Faith" Instruction.** Next, Hills and Al-Madani claim that the jury should have been given a "good faith" defense instruction.  Although the record is not specific about what instruction was requested, defendants now argue that it was an abuse of discretion not to have instructed the jury that:  "An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct."  Sixth Circuit Pattern Criminal Jury Instruction 10.04(2).  The government responded that the evidence did not support such a charge because the defendants' theories did not rest on an honest mistake in judgment or honest error in management.  *See United States v. Warren*, 782 F. App'x 466, 474 (6th Cir. 2019).  The district court agreed.

Good faith is a defense because "good faith on the part of the defendant is, simply, inconsistent with an intent to defraud."  Sixth Circuit Pattern Criminal Jury Instruction 10.04(1).

Because there is no claim that the jury was inaccurately or insufficiently instructed regarding the intent required to prove any of the offenses, any error in failing to also give a good faith instruction would be harmless. *See United States v. McGuire*, 744 F.2d 1197, 1201-02 (6th Cir. 1984). The jury's finding that a defendant acted with the requisite intent necessarily negates the possibility that the defendant acted in good faith. *See United States v. Damra*, 621 F.3d 474, 502-03 (6th Cir. 2010).

**4. Additional Instructions.** Alqsous and Al-Madani raise two new challenges to the jury instructions, which we may review only for plain error. First, they assert that the RICO instructions should have required proof that defendants conducted the enterprise or "participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). This argument misses the significance of the fact that defendants were not charged with violating 18 U.S.C. § 1962(c), but with *conspiracy* to violate § 1962(c). As discussed earlier, the RICO instructions correctly stated the law. Second, Al-Madani argues that it was error to instruct the jury that aiding and abetting applies to the conspiracy charges. That assertion is without basis. In fact, the jury was instructed that aiding and abetting was one of the ways that the government could prove the *substantive* counts.

In sum, defendants have failed to demonstrate instructional error occurred requiring a new trial.

## IV.  MOTION TO SUPPRESS

Alqsous appeals the district court's denial of his motion to suppress evidence seized from his home and cellular phone pursuant to a search warrant issued on the basis of the 70-page Master Affidavit of FBI Special Agent Kirk Spielmaker. Whether a search warrant affidavit established probable cause to conduct a search is a question of law that this court reviews de novo. *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Giving the judge's decision to issue the warrant great deference, this court asks whether there was "a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place [to be searched]." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (citation omitted).

Without disputing that the affidavit provided probable cause to believe crimes had been committed, Alqsous argued there was insufficient basis to believe there was a nexus between the place to be searched and the evidence sought. *See United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). As the district court pointed out, however, the Affidavit detailed a bribery and kickback scheme that included Alqsous making cash payments to Hills and using a personal check bearing his home address. Alqsous also used his residential address on some business checks and incorporation documents for at least one clinic connected to the alleged crimes. The Affidavit also stated that Alqsous told a confidential informant that he and others were removing files from one clinic, which he would have been required to keep for seven years. Further, Alqsous allegedly "used his phone to divert Medicaid patients from MetroHealth Hospital to one of his private clinics."

The district court did not err in finding there was sufficient basis to believe that evidence of a crime would be found in Alqsous's residence. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (explaining that "records of illegal business activity are usually kept at either a business location or at the defendant's home"). There also must be a fair probability that the evidence sought would *still* be found there. *Id.* Staleness depends on "the inherent nature of the suspected crime and the objects sought." *United States v. Akram*, 165 F.3d 452, 456 (6th Cir. 1999). The factors we consider in making that determination include: "(1) whether the character of the crime is a chance encounter or continuous in nature; (2) whether the suspected criminal is nomadic or entrenched; (3) whether the evidence to be seized is perishable or enduring; and (4) whether the place to be searched is a mere forum of convenience or secure operational base." *United States v. Hampton*, 760 F. App'x 399, 402 (6th Cir. 2019) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). The district court considered these factors in rejecting Alqsous's staleness argument because: "[t]he affidavit outlines an ongoing bribery and kickback scheme occurring over several years"; "Alqsous owned a home and several businesses in the area so he was 'entrenched' at the places to be searched"; "things sought to be seized (mostly business records) were the type that would be kept for an extended period of time (as opposed to drugs)"; and Alqsous's residence "was the type of place such records would be kept." Alqsous has not shown this was error.

Next, invoking the particularity requirement, Alqsous argues that the warrant was overly broad because it authorized the seizure of all communications between him and his coconspirators (Hills, Al-Madani Sayegh, or Julia Solooki), the employees or agents of Oral Health Enrichment, and current or former employees or agents of MetroHealth Hospital. *See Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (explaining that particularity requirement "prevents the seizure of one thing under a warrant describing another" (citation omitted)). In the case of paper documents, a reasonable search may include at least a cursory examination of "innocuous documents . . . in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen*, 427 U.S. at 482 n.11. Because the Affidavit provided a basis to believe that Alqsous used his cell phone in the alleged bribery and kickback schemes, authorizing a search of his communications for evidence was reasonable. *See United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (search of computer reasonable).

Lastly, even if the search warrant were found to be fatally defective, the evidence seized would not be suppressed "if the seizure was based on reasonable, good faith reliance on the warrant." *Abboud*, 438 F.3d at 578. The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 922-23 n.23 (1984). Although Alqsous asserts that *Leon* would not apply here because this was a "bare bones" affidavit, we agree with the district court that a reasonably well trained officer would not have known the search was illegal despite the magistrate judge's authorization. *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005); *see also United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) ("We must take care not to confuse a bare bones affidavit with one that merely lacks probable cause.").

## V.  SENTENCING ISSUES

Challenges to the procedural or substantive reasonableness of a sentence are reviewed for an abuse-of-discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). As for the calculation of the Guidelines range, this court reviews the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020). Deferential review applies when the issue involves a mixed question of law and fact. *Id.*

## A. Procedural Reasonableness

The defendants' offenses of conviction were properly grouped together under the RICO Guideline, which directs the court to use the base offense level applicable to the underlying racketeering activity.  U.S. Sentencing Guidelines Manual (USSG) § 2E1.1(a)(2) (2016).  PageID 19959.[22]

Over defendants' objections, the district court found that the "Bribery" Guideline (USSG § 2C1.1) applied to their underlying racketeering activity—not the "Gratuities" Guideline (USSG § 2C1.2).  PageID 24675-76, 23902-03.  Alqsous and Al-Madani insist that this was error because there was no proof of a quid pro quo—a theory the jury necessarily rejected.  *See United States v. Jones*, 260 F. App'x 873, 876-77 (6th Cir. 2008).  The Bribery Guideline explains that it "applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence such individual's official actions, or to a public official who solicits or accepts such a bribe."  § 2C1.1, cmt. (backg'd.).  Further, the statutes expressly associated with the Bribery Guideline confirm that it is the correct one to use here.  *See* USSG § 2C1.1, cmt. (Statutory Provisions); § 2X1.1; App. A (Statutory Index) (indicating applicable Guideline for Hobbs Act, honest services fraud, and mail fraud is § 2C1.1).  That is the case even though the index also references *both* § 2C1.1 and § 2C1.2 for offenses in violation of 18 U.S.C. § 666(a)(1)(B).  "If more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted."  USSG App. A.  Thus, the base offense level would be 12, or—as the district court found—14 because "the defendant was a public official."  USSG § 2C1.1(a)(1).

### 1.  Public Official – USSG § 2C1.1(a)(1)

Alqsous and Al-Madani renew their objection to the higher base offense level, arguing that the term "public official" should be defined *solely* by reference to the definition in 18 U.S.C. § 201(a).  That claim is without merit.  The Application Notes state not only that the term

---

[22]Although the tax offenses Hills was convicted of were grouped separately, they dropped out of the Guideline calculations because the offense level was less than for the RICO grouping.  For that reason, the unpaid taxes were not counted in determining the Guidelines range and were included only in the amount of restitution that Hills was ordered to pay.

"'public official' shall be construed broadly," but also that the definition from § 201 is only *one* of five categories of individuals who are to be considered public officials for purposes of the Guideline. *See* USSG § 2C1.1, cmt. (n.1). In particular, the definitions include: "An officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof, in any official function, under or by authority of such department, agency, or branch of government[.]" *Id.* The district court did not err in finding that each defendant was a public official subject to a base offense level of 14. *See Jones*, 260 F. App'x at 877 (finding state clerk who took bribes to approve driver's licenses was a public official for purposes of § 2C1.1).

### 2. More than One Bribe – USSG § 2C1.1(b)(1)

The offense level was increased by another 2 levels because "the offense involved more than one bribe or extortion." USSG § 2C1.1(b)(1). "Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." USSG § 2C1.1, cmt. (n.2). For example, multiple payments made by one resident would be a single incident; but the solicitation of different residents would count separately. Suffice it to say, we have no difficulty agreeing with the district court that there was more than one incident of bribery or extortion associated with the defendants' underlying offenses. *See, e.g.*, *United States v. Ford*, 344 F. App'x 167, 170 (6th Cir. 2009) (payments made to influence more than one event); *United v. Canestraro*, 282 F.3d 427, 430-32 (6th Cir. 2002) (discussing analogous provision in USSG § 2C1.2(b)(1)).

### 3. High Level Decisionmaker – USSG § 2C1.1(b)(3)

The district court also added 4 levels under § 2C1.1(b)(3), which applies when "the *offense* involved an elected public official *or* any public official in a high-level decision-making or sensitive position." (Emphasis added.) Contrary to Alqsous's assertion on appeal, this provision itself makes clear that it is not limited to offenses involving *elected* officials. Defendants also argue that it was error to find that Hills held a "high level decision-making position" based "primarily [on his] designation as Chair of the Department of Dentistry, as well

as COO [of MetroHealth]." It is true, as defendants point out, that MetroHealth was governed by a board, that the offenses did not directly involve Hills's authority as COO of MetroHealth, and the adjustments to the incentive bonuses were subject to further approval. Even so, it was not clearly erroneous to find that as the long-serving chair of the Dental Department of a county-owned hospital Hills held "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." USSG § 2C1.1, cmt. (n.4(A)).

**4. "Loss" Calculation – USSG § 2C1.1(b)(2)**

The Guideline accounts for the financial cost of the offenses by increasing the offense level based on the *greatest of*:

> [1] the value of the payment, [2] the benefit received or to be received in return for the payment, [3] the value of anything obtained or to be obtained by a public official or others acting with a public official, or [4] the loss to the government from the offense, [if it] exceeded $6,500.

USSG § 2C1.1(b)(2) (2016). The offense level is increased "by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." *Id.*; *see also United States v. Greco*, 734 F.3d 441, 444-45 (6th Cir. 2013). Here, the district court found that each of the defendants was responsible for a total of between $550,000 and $1.5 million, which corresponds to a 14-level increase in each of the offense level. *See* USSG § 2B1.1(b)(1)(H).[23]

Ultimately, while some of the subsidiary findings may present more difficult questions, any error in the calculation of the amount under § 2C1.1(b)(2) would be harmless because in no event would the total be less than the $550,000 that triggered the 14-level increase in the offense level. *See United States v. Perez-Martinez*, 746 F. App'x 468, 478-79 (6th Cir. 2018) (finding any error in the loss calculation would be harmless because it would not change the offense level calculation) (citing cases); *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005).

---

[23]An amount less than $550,000 (but more than $250,000) would result in an increase of 12 levels, while an amount less than $250,000 (but more than $150,000) would mean an increase of 10 levels. *See* USSG § 2B1.1(b)(1)(F)-(G).

We reach this conclusion after considering the defendants' arguments with respect to the district court's "loss" calculations.

It was the government's burden at sentencing to prove the amount by a preponderance of the evidence. *See United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011); *United States v. White*, 551 F.3d 381, 384-85 (6th Cir. 2008) (en banc). We review the district court's calculation of the amount for clear error, while we "consider the methodology behind it de novo." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). A defendant who challenges the amount on appeal must persuade us that the district court's calculation "was not only inaccurate, but outside the realm of permissible calculations." *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (quoting *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001)).

At the outset, defendants asserted that only one of the four methods listed in § 2C1.1(b)(2) may be used to calculate the amount (*i.e.*, benefit received or loss to the government). The district court properly rejected this contention. In fact, the Application Notes specifically instruct that: "In a case involving more than one incident of bribery or extortion, the applicable amounts under subsection (b)(2) . . . are determined *separately for each incident and then added together*." USSG § 2C1.1, cmt. (n.2) (emphasis added). The Guideline itself does not require otherwise and recognizes that the offense conduct may involve more than one incident of bribery or extortion. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) (explaining that an Application Note is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"). Defendants offer no authority to support their contention or any basis to disregard the Application Notes. It was not error for the district court to decide to make the calculations on a scheme-by-scheme basis, using the method that results in the greatest amount, and adding those amounts together.

In doing just that, the district court determined—over multiple hearings and with the benefit of extensive briefing—not only the amounts for each scheme but also the extent to which each defendant either was personally responsible or could be held accountable for the jointly undertaken activity of others as relevant conduct under USSG § 1B1.3(a)(1). *See* R. 468, 469, 539, 541, 607. The district court recognized that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the

conduct embraced by the law of conspiracy." *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000) (citation omitted). So, to hold a defendant responsible for the jointly undertaken activity of others, it was necessary to make particularized findings that such acts were within the scope of the defendant's agreement and foreseeable to him. *See United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

The district court found the following amounts should be counted for each scheme: (1) $661,176.90 from the "flex-time" scheduling policy; (2) $92,829 in upward adjustments to the incentive bonuses; (3) $105,126.94 in salary paid to Nassar; (4) $373,908 in salaries paid to the four dental residents who were solicited and/or paid bribes; (5) $17,600 paid to Hills in connection with the patient referrals to Buckeye; (6) $111,900 charged to nine OHE clients; (7) $99,961 that Hills received from Noble Dental in connection with work performed by MetroHealth's residents; and (8) $15,907.40 in dental services provided without charge to Jordan. The defendants were each held accountable for those amounts—except that Jordan's dental work was not counted against Al-Madani, and the resident bribery amounts were not attributed to Hills at all and were only partially attributed to Al-Madani. Once tallied, the district court attributed a total of $1,104,501.24 to Hills; $1,276,595.84 to Al-Madani; and $1,478,409.24 to Alqsous.[24]

The first (and largest) of those amounts—$661,176.90—was the total attributed to all three defendants as a result of the "flex-time" scheduling policy that was part of the Hobbs Act bribery conspiracy. That is, in return for things of value, Hills adopted and maintained the flex-time policy that allowed Alqsous, Al-Madani, and Elrawy to receive full-time pay for less than full-time work. Defendants repeat the earlier claim that there was nothing wrong with that policy because they worked more than 40 hours per week. But the district court did not clearly err in crediting evidence that all of MetroHealth's doctors (physicians and dentists) were expected to work five days per week (as well as typically more than 40 hours per week) in order to receive

---

[24]Alqsous argued that it was error to consider acquitted conduct. That claim misses the mark for two reasons. First, although acquitted of several substantive counts, Alqsous was convicted of conspiracies related to those same counts. Second, it is settled that acquitted conduct may be considered at sentencing if the facts are proven by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 157 (1997); *White*, 551 F.3d at 383.

full-time pay (or FTE 1.0). Indeed, there was evidence that Al-Madani's position changed from FTE .8 to FTE 1.0 shortly before Hills implemented the flex-time policy. The district court's credibility determinations are "'basically unassailable' on appeal." *Greco*, 734 F.3d at 446 (quoting *United States v. Maliszewski*, 161 F.3d 992, 1020 (6th Cir. 1998)). The district court reasonably estimated that the "benefit received or to be received" by Alqsous, Al-Madani, and Elrawy was being paid for five days per week (FTE 1.0) while working four days per week (FTE .8).

Defendants counter that MetroHealth suffered no "loss" because Alqsous, Al-Madani, and Elrawy were so much more productive under the flex-time policy than they would have been if they had worked a five-day, 40-hour week. That increased productivity might be a relevant set off if the district court had accepted the government's initial position that the harm should be based on lost revenue that could have been generated if they had worked five days per week. PageID 19450-51. The government posited that $3.3 million in revenue was lost and defendants argued that, if so, 25% would be owed back to them in incentives. PageID 19714-15. But the district court rejected the government's resulting claim of $2.5 million in lost productivity as too speculative. PageID 24130, 19958.

Instead, the district court found that the best measure was the "benefit received or to be received" by Alqsous, Al-Madani, and Elrawy as a result of the adoption of the flex-time policy—namely, full-time pay for less than full-time work. PageID 19958. The district court stood on solid ground in finding that the value of the benefit could reasonably and conservatively estimated as the difference between FTE 1.0 and FTE .8, or 20% of the full-time salaries they were paid from the adoption of the policy in February 2010 until Hills left MetroHealth at the end of 2014. Calculated individually and added together, that amount totaled $661,176.90.

Without contesting the math, defendants argue that the district court erred by refusing to offset that amount by the *overall* profit that Alqsous, Al-Madani, and Elrawy otherwise generated for MetroHealth during the same time period. But the district court found that the value of "the benefit received or to be received" for not having to work a five-day week was not reduced by profits generated for MetroHealth when they did work. Defendants contend that a

contrary result is required by our recent decision in *United States v. Kozerski*, 969 F.3d 310, 313 (6th Cir. 2020).  We disagree.

*Kozerski* recognized two general principles that apply to "loss" calculations under § 2B1.1 in the context of offenses involving fully performed, although fraudulently obtained, veteran set-aside construction contracts.  *Id.*  Those principles are that "loss generally refers to the pecuniary harm to the victim" and "loss generally turns on adding up the crime's face value and subtracting any value returned to the victim."  *Id.* (citing USSG § 2B1.1, cmt. (n. 3(A), (E))). In that case, Kozerski persuaded a service-disabled veteran to pretend to be the company's owner to win the first bid and then used that identity to secure additional contracts.  The government unsuccessfully argued that the "loss" was the entire amount paid under the fraudulently obtained contracts without any credit for the work that was fully performed under those contracts.  *Id.* at 312.  That was wrong, we explained, because "loss" to the victim was to be determined in the same way as in a case of a procurement contract obtained by fraud.  *Id.* at 313 (citing USSG § 2B1.1, cmt. (n.3(A)(v)(II))).  That is, under ordinary loss calculation rules, "Kozerski should receive credit for the work his company performed on the construction contracts."  *Id.* Consistent with those principles, the district court had used "the aggregate difference between Kozerski's bid and the next-lowest bid on each contract" to estimate the "profits lost by the service-disabled veterans the program was intended to benefit."  *Id.* at 316.  We found no clear error, and affirmed.  *Id.*

The general principles of loss calculation discussed in *Kozerski* have application to § 2C1.1(b)(2) in two ways.  First, a cross-reference in § 2C1.1 incorporates the definition of "loss" from "Application Note 3 of the Commentary to § 2B1.1."  USSG § 2C1.1, cmt. (n.3). So, when determining "loss to the government," the loss must be reduced or credited for, among other things, "services rendered by the defendant or other person acting jointly with the defendant, to the victim before the offense was detected."  USSG § 2B1.1, cmt. (n.3(E)(i)); *see also Kozerski*, 969 F.3d at 315 (explaining that there can be more than one victim).  However, nothing in *Kozerski* suggests that Kozerski could have claimed a credit for work performed on unrelated contracts that were not procured fraudulently.  *See, e.g.*, *United States v. Anders*, 333 F. App'x 950, 955 (6th Cir. 2009) (district court must apply offset to amount of loss when

defendant provided legitimate services related to the fraud).  *Kozerski*, and the Guidelines it interprets, reflect generally that the value returned is determined in relation to the loss or pecuniary harm at issue.  Applying the general principles (and seeing no special rules that would apply), the fact that MetroHealth profited greatly from work performed by Alqsous, Al-Madani, and Elrawy when they were working would not lessen the "loss" to MetroHealth for the portion of the salaries it paid for work not performed.  *See United States v. Burns*, 104 F.3d 529, 536 (2d Cir. 1997) (finding "salary loss" for less than full-time work was reasonably estimated by determining the portion of salary paid while defendant was otherwise participating in an educational program).

Second, and as directly relevant here, *Kozerski*'s general principles find an analog when determining the benefit received or to be received.  The Application Notes to § 2C1.1 provide that "[t]he value of the '*benefit received or to be received*' means the net value of such benefit." USSG § 2C1.1, cmt. (n.3).  That directive is followed by two examples:  "(A) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000"; and "(B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."  *Id*.  Here, in return for things of value, Hills adopted and maintained a policy allowing Alqsous, Al-Madani, and Elrawy to continue to receive full-time pay for less than full-time work.  The value of that benefit is the difference reflecting the pay for work that was not performed; no offset from that would be appropriate for gross profits generated from the work they did perform.**[25]**

The district court did not clearly err in determining the value of the benefit received or to be received from the flex-time scheduling policy for purposes of § 2C1.1(b)(2) to be $661,176.90.  Because that amount exceeded $550,000, the district court did not err in applying the 14-level increase to the defendants' offense levels.  *See* USSG § 2B1.1(b)(1)(H).  Defendants renew some of their objections to other amounts, as they must, but any error would be harmless

---

**[25]**Nor could the gross profits generated for MetroHealth be used to offset the $99,961 that Hills received for sending less than fully licensed dental residents—including Alqsous and Al-Madani—to work at Noble Dental Clinic.  The same is true for the $17,600 in patient referral kickbacks paid to Hills and the $15,907.40 in services provided without charge to Jordan at MetroHealth.

because it could not affect the calculation of their applicable Guidelines ranges.  *See Perez-Martinez*, 746 F. App'x at 477; *United States v. Johnston*, 631 F. App'x 381, 385 (6th Cir. 2015) (finding harmless error because "even if the contested amount were excluded from the loss calculation, the total loss would still exceed $2.5 million and Johnston would be subject to the same 18-level enhancement").

### 5.  Role in the Offense – USSG § 3B1.1

Hills and Alqsous also received upward adjustments for their role in the offense.  The government had the burden to prove these enhancements applied by a preponderance of the evidence.  *See United States v. Sexton*, 894 F.3d 787, 795 (6th Cir, 2018).  We review the district court's conclusion with respect to a defendant's role in the offense "deferentially, and its factual findings for clear error."  *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017).

Hills objected to the 4-level increase he received based on the finding that he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  USSG § 3B1.1(a).  Hills does not deny that he was an "organizer or leader," which is determined from factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation and planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  *Id*. at cmt. (n.4).

Instead, Hills disputed whether the government proved that the criminal activity involved five or more participants.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  USSG § 3B1.1, cmt. (n.1).  We assume, as Hills argued at sentencing, that Sayegh and his unindicted family members should not count because they were involved only in the resident bribery scheme with which Hills was not charged.  Nonetheless, the record supported the finding that Hills was an organizer or leader of criminal activity that involved at least five participants—Hills, Alqsous, Al-Madani, Elrawy, and Solooki—even though two of them were not charged.  Moreover, the district court also found that this aggravating role adjustment was warranted because the criminal activity Hills organized

and led was "otherwise extensive" given the number and extent of the conspiracies with which Hills was convicted. The district court did not err in applying this 4-level increase to Hills's offense level.

Alqsous appeals the 2-level adjustment he received for his role as an organizer, leader, manager, or supervisor of "one or more other participants" in a criminal activity. USSG § 3B1.1(b), cmt. (n.2). In overruling Alqsous's objection, the district court found that Alqsous was the primary organizer and manager in the Hobbs Act conspiracy, which was confirmed by texts between Hills and Alqsous and between Alqsous and Al-Madani and Elrawy. There was evidence that Alqsous instructed Al-Madani and Elrawy about their share of the funds to be provided to Hills, arranged for them to meet to purchase the Louis Vuitton bag for Hills, and instructed Al-Madani or Elrawy to call in prescriptions for Hills's benefit. We find no clear error in the district court's factual findings, and our deferential review of the legal conclusion that Alqsous was an organizer, leader, or manager is based on recognition that the "trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader' of a conspiracy that the jury found existed." *Washington*, 715 F.3d at 983.

### 6. Obstruction of Justice – USSG § 3C1.1

The district court imposed a 2-level enhancement for obstruction of justice on each defendant, which typically requires particularized findings that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1; *see also United States v. Rosales*, 990 F.3d 989, 998 (6th Cir. 2021). The district court made specific findings that the defendants each engaged in conduct that warranted this adjustment. We need not examine those findings, however, because the district court recognized that this 2-level increase was also proper due to the grouping of the obstruction offenses with the closely related fraud offenses.

All three defendants were convicted of conspiracy to obstruct justice, and Al-Madani was also convicted of making false statements to the FBI in connection with the investigation. Those offenses would fall under USSG § 2J1.2, except that when "the defendant is convicted of an

offense sentenced under this section as well as for the underlying offense (*i.e.*, the offense that is the object of the obstruction)," we are to look to "the Commentary to Chapter Three, Part C (Obstruction and Related Adjustments) and to § 3D1.2(c) (Grouping of Closely Related Counts)." § 2J1.2, cmt. (n.3).  When we do, the Commentary to § 3C1.1 explains that when "the defendant is convicted of both an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred)," the counts are to be grouped under § 3D1.2(c) and "*[t]he offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section,* or the offense level for the obstruction offense, whichever is greater."  USSG § 3C1.1, cmt. (n.8) (emphasis added); *see also id.* cmt. (n.5).  The district court recognized as much, and did not err in applying this 2-level increase to each defendant's offense level.  *See Johnston*, 631 F. App'x at 385; *United States v. Lindsay*, 931 F.3d 852, 869-70 (9th Cir. 2019) (finding error in failure to apply enhancement to grouped offenses).

Overall, the district court did not err in calculating the total adjusted offense levels for the defendants and their criminal history played no part because all three had a Criminal History Category of I.  After determining the applicable Guidelines ranges, the district court granted each defendant a 4-level downward variance and imposed concurrent sentences at the bottom of their new range.  Defendants were sentenced to terms of imprisonment totaling 188 months for Hills, 151 months for Alqsous, and 121 months for Al-Madani.  Their sentences were not procedurally unreasonable.[26]

**B.  Substantive Reasonableness**

"A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals) or too short (if the government appeals)." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir 2018).  When, as here, a defendant argues that his below-Guidelines sentence is substantively unreasonable, a presumption of reasonableness applies and the "task of

---

[26]Hills was sentenced to concurrent terms of 188 months for Counts 1, 2, 8-12, and 28-29; 60 months for Counts 13-20; and 36 months for Counts 31-33.  Alqsous was sentenced to concurrent terms of 151 months for Counts 1, 2, 4, 8, 28 and 29; 120 months for Count 5; and 60 months for Counts 3, 13, and 21-27.  Al-Madani was sentenced to concurrent terms of 121 months for Counts 1, 2, 4, 8, and 28-29; 120 months for Counts 6-7; and 60 months for Counts 3, 13, 21-27.

persuading us that the more lenient sentence [] is unreasonably long is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008). We find no abuse of discretion here.

Defendants moved for a downward variance on a number of grounds, which the district court granted over the government's objections. Alqsous, joined by Al-Madani, argues that the district court failed to give sufficient weight to one of the § 3553(a) factors—namely, "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The record reflects that the district court considered the government's reliance on a handful of other bribery and kickback cases as well as the analysis of certain Sentencing Commission data provided by Alqsous. In weighing all of the § 3553(a) factors, the district court specifically considered the need to avoid unwarranted disparities and acknowledged the arguments, charts, and other cases addressed in the briefing.

Although Sentencing Commission data "may be helpful as a 'starting point for district judges' in attempting to avoid an unwarranted sentencing disparity among similarly situated defendants," district judges are not required to consider it. *United States v. Hymes*, 19 F. 4th 928, 935 (6th Cir. 2021) (citation omitted). Moreover, the Supreme Court emphasized in *Gall* that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall*, 552 U.S. at 54. As a result, "having correctly calculated and carefully reviewed the Guidelines range, [the district judge] necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Id*.

Here, to the extent that Alqsous compares his sentence to those of defendants convicted of kidnapping, criminal sexual abuse, or child pornography, the data are not helpful because those defendants were not found guilty of "similar conduct." Nor is the comparison to all defendant sentenced under § 2C1.1 with a Criminal History Category of I (CHC I) particularly telling where the defendants here received increases to their offense levels under § 2C1.1(a)(1), (b)(1), (b)(2) and (b)(3). Narrowing the data set to more comparable offenders—those sentenced under § 2C1.1, with a total offense level of 38, a CHC I, comparable statutory penalties, and no government motion for downward departure—Alqsous represents that there were fifteen offenders (including himself) and only one of whom did not receive a downward variance.

Disregarding the one sentence at the bottom of the Guidelines range as an "outlier," Alqsous plotted the "mean" or "average" of the remaining sentences. Even taking this analysis at face value, the upshot is a claim that it was an abuse of discretion not to vary downward farther—*i.e.*, "only" 35% below the low end of the range rather than the median downward variance of 48.9%. This falls woefully short of demonstrating that the below-Guidelines sentence of 151 months (84 months below the bottom of his applicable Guidelines range) was still unreasonably long. A district court's weighing of all of the § 3553(a) factors "is a matter of reasoned discretion, not math, and our highly deferential review of a district court's sentencing decisions reflects as much." *Rayyan*, 885 F.3d at 442.[27]

## C.  Restitution

The Mandatory Victim Restitution Act ("MVRA") requires that a district court "order restitution from a defendant convicted 'of an offense against property . . . including any offense committed by fraud or deceit' if an identifiable victim has suffered a loss." *United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018) (citation omitted); *see* 18 U.S.C. § 3663A(a), (c)(1). The government has the burden to prove the amount of the victim's loss by a preponderance of the evidence. *Id.*; *see* 18 U.S.C. § 3664(e). We review whether restitution is permitted de novo, but the amount of restitution ordered is reviewed for abuse of discretion. *See United States v. Kilpatrick*, 798 F.3d 365, 387-88 (6th Cir. 2015).

The record shows that the district court understood the difference between the Guideline calculations under § 2C1.1(b)(2) and an order of restitution under the MVRA. (R. 536.) Specifically, the district court found two victims:  the IRS and MetroHealth. There is no dispute that Hills was properly ordered to pay restitution to the IRS in the amount of $80,426. Nor did the defendants challenge the amount of loss to MetroHealth from the upward adjustments to the incentive bonuses ($92,829) or the dental services provided to Jordan without charge ($15,907.40). PageID 23856.

---

[27]Al-Madani makes no arguments specific to his sentence. The record reflects that he also received a 4-level downward variance and a below-Guidelines sentence of 121 months (67 months below the bottom of his applicable guidelines range). Al-Madani has not demonstrated that his sentence was substantively unreasonable.

Restitution was also ordered in the amount of attorney fees incurred by MetroHealth, after the district court required MetroHealth to excise any fees that were not incurred during participation in the government investigation or criminal proceedings as required by *Lagos v. United States*, 138 S. Ct. 1684 (2018). The district court applied the lodestar method, found attorney fees of $143,928.57 were reasonable, and ordered restitution in that amount against Hills, Alqsous, and Al-Madani, jointly and severally. Defendants have not challenged that amount anywhere on appeal. That leaves only the $661,176.91 in restitution ordered for losses to MetroHealth from the flex-time scheduling policy.**28**

"Restitution is 'intended to compensate victims only for losses caused by the conduct underlying the offense of conviction.'" *Kilpatrick*, 798 F.3d at 388 (quoting *Hughey v. United States*, 495 U.S. 411, 416 (1990)). That generally means "that the defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations." *Id.* (quoting *United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (collecting cases)). As a result, "a district court may not use the defendant's gain to approximate the victim's loss unless the government establishes such a correlation that the defendant's gain can act as a *measure of—not a substitute for*—the victim's loss." *Id.* at 390 (emphasis added) (citing *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012)). That is precisely the case here.

The gain to defendants was receiving full-time pay for less than five days of work per week; and the loss to MetroHealth was paying the same full-time salaries for less than five days of work per week. That the district court was not simply substituting one for the other is demonstrated by the colloquy and findings during the restitution hearing, especially in rejecting Al-Madani's request for a set off of $49,622.75 to account for those weeks in which he worked on a Saturday and that Saturday was also his fifth day of work for that week. PageID 23858-69.

The district court asked whether the full-time schedules could include Saturdays, or whether being called in to work on a Saturday was typically a sixth day that would be compensated only through the incentive bonus program. When no evidence was identified that directly answered the question, the district court turned to Al-Madani's chart and observed

---

**28**There was a difference of .01 between the "loss" calculation under § 2C1.1(b)(2) and the restitution ordered under the MVRA.

several weeks in which he worked a Saturday but still worked only three days that week. Without a basis to determine how many weeks Al-Madani, Alqsous, or Elrawy worked two days, three days, or four days, the district court found that 20% of their full-time salaries was "a reasonable estimate over time" of the loss to MetroHealth from the flex-time policy. The district court did not abuse its discretion in finding their gain from the flex-time policy was also the appropriate measure of the loss to MetroHealth from the flex-time policy. It was not error to include $661,176.91 in restitution against Hills, Alqsous, and Al-Madani, jointly and severally.

\*     \*     \*

The convictions, sentences of imprisonment, and restitution orders of Hills, Alqsous, and Al-Madani are **AFFIRMED**, and the order denying Alqsous's motion to extend time to appeal the denial of his motion to amend his post-judgment motion for acquittal or new trial also is **AFFIRMED**.